IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DAVID LEE ROSENBERG,<br><br>     Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,<br><br>     Defendant. | 4:13-CV-3114<br><br>MEMORANDUM AND ORDER |

  This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff David Lee Rosenberg's application for supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*. The Court has considered the parties' filings and the administrative record. For the reasons discussed below, the Commissioner's decision will be affirmed.

## I. PROCEDURAL BACKGROUND

  Rosenberg applied for SSI benefits in February 2011, with a protective filing date of January 25, 2011. T15, 124–129.[1] His claim was denied initially and on reconsideration. T58–70. Following a hearing on May 2, 2012, the administrative law judge (ALJ) found that Rosenberg was not disabled as defined under 42 U.S.C. § 1382c(a)(3)(A), and therefore not entitled to benefits under the Social Security Act. T12–27.

  To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 416.920(a)(4). At step one, the claimant has the burden to establish that he has not engaged in substantial gainful activity since his alleged disability onset date. *Id*.; *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). If the claimant has engaged in substantial gainful activity, he will be found not to be disabled; otherwise, at step two, he has the burden to prove he has a medically determinable physical or mental impairment or combination of impairments

---

[1] All citations to the administrative record (filings 12 through 12-9) are given as "T [Transcript]" followed by the page number.

that significantly limits his physical or mental ability to perform basic work activities. *Gonzales*, 465 F.3d at 894.

At step three, if the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, he is automatically found disabled and is entitled to benefits. *Id.* Otherwise, the analysis proceeds to step four, but first, the ALJ must determine the claimant's residual functional capacity (RFC), which is used at steps four and five. 20 C.F.R. § 416.920(a)(4). A claimant's RFC is what he can do despite the limitations caused by any mental or physical impairments. *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007). At step four, the claimant has the burden to prove he lacks the RFC to perform his past relevant work. *Gonzales*, 465 F.3d at 894. If the claimant can still do his past relevant work, he will be found not to be disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.*

Rosenberg alleged disability primarily as a result of mental impairments, including, among other things, attention deficit hyperactivity disorder (ADHD), problems with anger management, disruptive behavior disorder, and a global learning disorder.[2] T162. Rosenberg was born in 1992, and alleges that his conditions became disabling in June 1996. T15, 124. The reason for this date is not clear. In any event, SSI benefits are not awarded retroactively for months prior to the application for benefits. *See* 20 C.F.R. §§ 416.330 and 416.335. So, the question that was before the ALJ, and which is now before this Court, is whether Rosenberg proved disability from the date of his application, January 25, 2011, through the date of the ALJ's decision, May 2, 2012. *See* 20 C.F.R. § 416.330.

At step one, the ALJ found that Rosenberg had not engaged in substantial gainful activity since January 25, 2011. T17. At step two, the ALJ found that Rosenberg had the following severe impairments: ADHD, intermittent explosive disorder by history, disruptive behavior disorder/conduct disorder by history, a mood disorder, and a learning disability. T17–18. At step three, the ALJ found that Rosenberg did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment. T18–19.

The ALJ determined that Rosenberg had the RFC to perform a full range of work at all exertional levels but with several non-exertional

---

[2] The record also suggests that Rosenberg suffers from some physical impairments, such as asthma. T162. But Rosenberg does not argue that the ALJ erred in finding his physical impairments to be non-severe, *see* T17–18, and the Court will not discuss them further.

limitations. The ALJ found that Rosenberg could perform simple tasks, but was limited to jobs that do not demand attention to details or complicated job tasks or instructions; that he could work in proximity to others, but was limited to jobs that do not require close cooperation and interaction with coworkers, in that he would work best in relative isolation; and that Rosenberg was limited to no interaction or cooperation with the general public. Finally, the ALJ found that Rosenberg retained the ability to maintain attention and concentration for a minimum of 2-hour periods at a time, adapt to changes in the workplace on a basic level, and accept supervision on a basic level. T19–20.

The ALJ found, at step four, that Rosenberg had no past relevant work, and so proceeded to step five. T26 Relying upon the testimony of a vocational expert, the ALJ found that Rosenberg could perform the jobs of kitchen helper, industrial cleaner, and order filler. T26–27, 55. So, the ALJ concluded that Rosenberg was not disabled. T27.

On April 18, 2013, the Appeals Council of the Social Security Administration denied Rosenberg's request for review. T1–4. Rosenberg's complaint (filing 1) seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g), pursuant to 42 U.S.C. § 1383(c)(3). In his appeal to this Court, Rosenberg argues generally that the RFC failed to properly account for all of the limitations caused by his mental impairments.

## II. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id.* The Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id.*

## III. FACTUAL BACKGROUND

As a child, Rosenberg was diagnosed with ADHD, intermittent explosive disorder, impulse control disorder, mood disorder not otherwise

specified (NOS), and cognitive disorder (NOS).[3] T228–32. He was also diagnosed with learning disabilities, and received special education services throughout his childhood. T47, 339. As a young teenager, Rosenberg participated in intensive psychiatric treatment. After other treatments proved unsuccessful, Rosenberg was referred to an inpatient treatment center in September 2008. T21, 44, 228–236, 365. Upon admission, Rosenberg was diagnosed with (among other things) intermittent explosive disorder, ADHD (NOS), learning disorder (NOS), and conduct disorder, childhood onset, severe. T229. With treatment, Rosenberg's condition eventually showed some improvement, and in December 2009, he was discharged. T37–38, 45, 234–37, 302, 331, 339. Shortly thereafter, Rosenberg moved back in with his grandparents, who had raised him as a child. T43. Rosenberg also returned to school, although he stopped attending after completing the tenth grade. T37.

Following his discharge, Rosenberg began outpatient therapy with Stephanie Morse, LIMHP, and participated in weekly and monthly therapy and counselling sessions. *See* T157, 383, 406–18. Rosenberg saw his primary care physician, David G. Lindley, M.D., for medication management. *See* T379–380, 420. From at least 2010, and for the entire period under consideration, Rosenberg has generally taken the same combination of prescription medications (with some adjustments in dosage). This includes two drugs used as mood stabilizers, and another used to treat ADHD. *See, e.g.*, T160, 165, 181, 192, 237, 300, 406, 417, 429.

In June 2010, Morse wrote a letter identifying her concerns regarding Rosenberg's ability to work in a public setting. T415. Morse wrote that Rosenberg was highly irritable and could become enraged when things did not go his way. She said he had trouble sustaining concentration and understanding what he was told, and that he had difficulty compromising and taking redirection from others. Morse wrote that he had a borderline IQ and severe problems with thought processing. However, Morse's treatment notes show that Rosenberg continued to work through therapy and counselling and that over the course of several months, he made some progress. *See* T406–18. This progress is also reflected in Morse's appraisal of Rosenberg's Global Assessment of Functioning (GAF).[4] In December 2009,

---

[3] On the date of the ALJ's decision, Rosenberg was 20 years old. By that time, he had already had an extensive history of treatment for his mental impairments. The Court has fully reviewed the records from the years prior to Rosenberg's application for benefits; however, the Court will discuss these records only briefly, as they do not reflect Rosenberg's condition for the period under consideration.

[4] A GAF is "the clinician's judgment of the individual's overall level of functioning," not including impairments due to physical or environmental limitations. *See* American

- 4 -

Morse rated Rosenberg's GAF as 50, and by mid-2011 she upgraded it to 55 or 60.[5] T406, 418.

On July 16, 2010, Rosenberg met with Lloyd Lee Kimzey, Jr., Ph.D., for a consultative psychological examination. T338. Kimzey's diagnoses were ADHD, combined type, by history; intermittent explosive disorder; disruptive behavior disorder (NOS); Arithmetic Disorder; Reading Disorder; and Disorder of Written Language; as well as rule out personality disorder (NOS). Kimzey assessed Rosenberg with a GAF of 45. T342. Kimzey wrote that Rosenberg had no restrictions on his activities of daily living, but that in the past, Rosenberg had experienced difficulty in maintaining social functioning. T341. Kimzey also noted that it was likely that Rosenberg's behavior would deteriorate under stress. T341. Kimzey concluded:

> Sustained attention and concentration are somewhat impaired. David does have the capacity to recall short simple instructions, yet the manipulation of memory data is very difficult. He does appear capable of carrying out instructions under ordinary levels of supervision. Relating to coworkers and supervisors can be reasonable yet caution with regard to boundaries will be necessary. Adapting to environmental change is likely to be difficult.

T342. Kimzey noted that Rosenberg was still receiving a high level of outpatient care, but he "hoped that over time progress will be sufficient to allow for independent functioning," although it was "likely that such improvements will be slow developing." T342.

On August 6, 2010, agency consultant Patricia Newman, Ph.D., completed two forms: a Psychiatric Review Technique Form (PRTF) and a Mental RFC Assessment. T353, 368. In the PRTF, Newman reviewed Rosenberg's records and concluded that his mental conditions resulted in moderate restrictions in his activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence,

---

Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (hereinafter, "*DSM-IV-TR*"). The GAF scale is divided into ten ranges of functioning, from 0 to 100, with a score of 100 representing superior functioning. *Id.* at 32–34.

[5] A GAF of 41 to 50 signifies serious symptoms, such as thoughts of suicide, or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *DSM-IV-TR* at 34. And a GAF of 51 to 60 signifies moderate symptoms or moderate difficulty in the same areas of functioning (e.g., few friends, conflicts with peers or coworkers). *Id.*

or pace.[6] T363. In the Mental RFC Assessment, Newman assessed Rosenberg's ability to perform various work-related tasks. Newman generally found that Rosenberg could understand, remember, and carry out short and simple instructions, but was moderately limited when it came to handling detailed instructions, maintaining concentration for an extended period, and getting along with coworkers and the public.[7] T368–70.

Newman explained that her findings were based upon mental status examinations and intellectual testing, which showed low average to average intellectual ability, attention, and concentration. She had also accounted for Rosenberg's mood fluctuations and personality conditions. T370. Newman acknowledged Rosenberg's history of institutionalization, but noted that with treatment he was able to interact appropriately at home and in his group therapy settings. Newman concluded that Rosenberg possessed the social skills to work in many positions, although he would perform best in jobs where he did not have to interact frequently with others. T370.

Over the following months, Rosenberg continued to meet with Morse and Lindley. The record contains several (brief) treatment notes from Lindley from this period. At a November 2010 appointment, Lindley wrote that Rosenberg was doing "really well and he is very stable with no significant problems." T379. In February 2011, Lindley wrote that Rosenberg was feeling well overall with "no significant problems today." T380. And in December 2010, and February and April 2011, Lindley wrote that Rosenberg's ADHD medication was "working well." T380, 420.

Rosenberg's grandmother, Mary Rosenberg, described her grandson's functioning in a report from February 2011. T153, 160. She wrote that he had a difficult time reasoning things out, and would become frustrated when working on something that he did not understand. This frustration could lead to verbal or physical aggression, or "shutting down and not performing the task." She wrote that he had difficulty utilizing coping skills when he was stressed, had trouble adapting to changes in his routine, needed "constant prompts" to stay on task, had a very short attention span, and could not understand long or difficult instructions. T153, 159. Mary stated that Rosenberg had difficulty understanding monetary transactions and could not shop by himself, and that his social skills were very limited, such that he had a hard time interacting with people he did not know. T153. She estimated

---

[6] This was on a scale from that ranged from "none" to "mild," "moderate," "marked," and "extreme." T363.

[7] This was on a scale that ranged from "no evidence of limitation" to "not significantly limited," "moderately limited," and "markedly limited." T368.

- 6 -

that he could pay attention for only about 10 minutes, and that he could only follow simple, one or two-step instructions. T159.

Mary also described her grandson's daily activities. She wrote that she had to remind him to perform activities of daily living, such as taking a shower and putting on clean clothes. T153–54. Rosenberg helped around the house with chores, such as yard work, cleaning his room, and feeding their pets. T155. But Mary wrote that he needed prompts to do each task, and "authority to make [him] do them." T155. He went to his counselor twice a week and the community center once a week. And 5 days a week he was taking GED classes, which lasted for 2 hours in the morning and 2 hours in the afternoon. T157, 382.

On April 6, 2011, Rosenberg met with Kimzey for a second consultative examination. T382. This time, Kimzey observed that Rosenberg was doing quite well and that his condition and prognosis had improved since their last visit. T385. Rosenberg was participating in outpatient therapy on a weekly basis and individual and family counseling every other week. T383. His grandmother, who had accompanied him to the examination, reported that his mood tended to vary to some extent, and that on some days he was irritable. But Rosenberg also said that he was happy most of the time and reported no current emotional or behavioral difficulties. T383–84.

Kimzey's diagnoses remained roughly the same, but he upgraded Rosenberg's GAF to 65.[8] T385. Kimzey concluded that Rosenberg had no restrictions in his activities of daily living, that his sustained attention and concentration were "good for the current appointment with his medication onboard," that he had the capacity to understand, recall, and carry out basic instructions under ordinary supervision, and that he could adequately relate to coworkers and supervisors. T384.

On April 11, 2011, agency consultant Linda Schmechel, Ph.D., completed an updated PRTF and Mental RFC Assessment. Like Newman, Schmechel concluded that Rosenberg continued to have moderate difficulties in social functioning. T396. But Schmechel found that Rosenberg's condition had otherwise improved. Whereas Newman had found Rosenberg to have moderate restrictions in activities of daily living and moderate difficulties in maintaining concentration, persistence, or pace, Schmechel found no restrictions on the former and only mild difficulties with the latter. *Compare* T363 *with* 396.

---

[8] A GAF of 61 to 70 signifies "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning" but generally shows that a person is "functioning pretty well, [and] has some meaningful interpersonal relationships." *DSM-IV-TR* at 34.

Schmechel's Mental RFC Assessment was more or less the same as Newman's. For example, Schmechel found moderate limits, as opposed to no significant limits, in Rosenberg's ability to understand and remember very short and simple instructions. However, whereas Newman had opined that Rosenberg was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychological symptoms and to perform at a consistent pace, Schmechel found no significant limitations in this category. *Compare* T368–69 *with* 401–02. In June 2011, agency consultant Glenda L. Cottam, Ph.D., reviewed the records up to that date and agreed with Schmechel's findings. T426–27.

In July 2011, Rosenberg met with Randall G. Sullivan, M.D., for psychiatric treatment. Rosenberg reported that he was doing fairly well, and was not certain he still needed to take his medications. His grandmother said that his biggest problem was that he was unable to care for himself. She explained that Rosenberg had difficulty managing money and even making change, and that he made "bad personal decisions for himself." Sullivan's diagnoses were similar to previous providers' diagnoses, and he rated Rosenberg's GAF as 61 to 70. Sullivan recommended that Rosenberg continue his current medications, although he would consider adjusting the dosages. Sullivan also recommended that Rosenberg seek out vocational rehabilitation. He concluded that with treatment and attention to educational, occupational, and social issues, Rosenberg's prognosis would be significantly improved. T428–31.

Rosenberg met with Sullivan once more in August 2011. T432. Rosenberg and his grandmother reported he was doing fairly well, and neither could identify any particular problems. He was doing "at least moderately well" on the ADHD medication, and both Rosenberg and his grandmother agreed that his attention and concentration were probably a bit better, although he still appeared a bit fidgety and distractible. His anger outbursts had been under good control, except for one relatively minor occurrence. Sullivan agreed that Rosenberg appeared to be doing fairly well, but questioned how reliable he and his grandmother were in their reports of his behavior. T432. Sullivan continued Rosenberg on his medications, with some adjustments, and raised his GAF to 71 to 80.[9] T432–34.

In May 2012, the ALJ held a hearing at which Rosenberg and his grandmother testified. Mary Rosenberg testified regarding her grandson's

---

[9] A GAF of 71 to 80 range means that, "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after [a] family argument;" and a score in this range signifies "no more than [a] slight impairment" in functioning. *DSM-IV-TR* at 34.

daily functioning and activities. She said that he liked to ride his bike, play video games, and visit family and friends perhaps once or twice a week. T46, 49. He still helped "quite a bit" with chores around the house. T46, 52. She testified that Rosenberg would play video games for as long as she allowed, and that he also loved to read. T49; *see also* T319. Mary testified that he was a loner and did not like crowds, although he generally got along "pretty good" with people. Mostly he interacted only with his family and a few close friends. T46, 50.

Rosenberg also testified briefly at the hearing, although it soon became apparent that he was having some trouble understanding the questions, and the ALJ noted that he was having difficulty getting Rosenberg to respond. He did offer some testimony on his daily activities, explaining that he played video games "a lot," which typically meant about an hour in the morning and up to 9 hours a night. T53. Rosenberg also stated that he had taken a GED test, and had passed several portions, but did not pass the entire test. T37–38.

### IV. ANALYSIS

Rosenberg asserts that the ALJ failed "to apply the 'disability impairments' on [sic] the claimant's ability to perform actual work functions." Filing 15 at 3–4. The Court understands Rosenberg to be arguing that the ALJ erred by failing to incorporate all of the limitations caused by his mental impairments into his RFC. Related to this argument, Rosenberg contends that the RFC was not supported by sufficient medical evidence, and that the ALJ failed to develop the record. He also asserts, briefly, that the ALJ failed to address his inability to afford further treatment. Finally, Rosenberg contends that the ALJ failed to address the "impact of a GAF score of 50 on [his] ability to perform work on a full time basis." Filing 15 at 4. The Court considers each argument in turn.

#### A. THE ALJ'S RFC DETERMINATION

To determine a claimant's RFC, the ALJ must consider the impact of all the claimant's medically determinable impairments, even those previously found to not be severe, as well as their related symptoms. 20 C.F.R. §§ 416.929(d)(4), 416.945(a)(1) and (2). This determination requires a review of all relevant evidence in the case record. 20 C.F.R. § 416.945(a). That includes the statements by the claimant or others about the intensity, persistence, and limiting effects of the claimant's symptoms. 20 C.F.R. § 416.929(c)(4). For mental impairments, the RFC determination involves a detailed assessment of the claimant's ability to carry out the specific mental requirements of work, such as the ability to understand, remember, and carry

out instructions; and to respond appropriately to supervision, coworkers, and work pressures in a work setting. *See*, 20 C.F.R. §§ 416.945(c) and 416.969a(c); SSR 96-8p, 1996 WL 374184 (July 2, 1996).

In this case, the ALJ found support for his RFC determination primarily in the opinions of Kimzey, Schmechel, and Cottam. The RFC essentially incorporated the limitations suggested by their opinions. The ALJ gave significant weight to Kimzey's findings because he was able to examine Rosenberg twice, and because his opinions were consistent with his examination findings and with the record as a whole. T24. Specifically, the ALJ gave significant weight to Kimzey's findings from April 2011, which reflected Rosenberg's functioning during the period under consideration. And the ALJ gave significant weight to the opinions of Schmechel and Cottam because they had access to nearly all of the evidence at the time their opinions were formulated, and because their opinions were consistent with the record as a whole. Rosenberg does not argue that there was anything lacking in these opinions or that it was improper to rely upon them, and the Court likewise finds no error in the ALJ's decision to accord these opinions significant weight.

The ALJ reasoned that, while Rosenberg had experienced more significant limitations in the past, his condition for the period under consideration was much improved, due to his increased maturity and a consistent course of treatment. T25. Again, the ALJ's finding is reasonable and supported by the record. Rosenberg's improvement is reflected not only in Kimzey's opinions, but also in the treatment notes of Morse and Sullivan. *See* T406, 418, 430–34.

There are only three sources in the record which suggested that further limitations in Rosenberg's RFC were warranted: the reports and testimony of Rosenberg and his grandmother, the June 2010 letter from Morse, and a May 2011 treatment note from Lindley (discussed below). The ALJ addressed each. The ALJ determined that, to the extent Rosenberg and his grandmother suggested more severe limitations, their reports and testimony were not credible. T20, 25–26. And the ALJ found that Morse's letter did not reflect Rosenberg's current level of functioning. T23. Finally, the ALJ determined that (for several reasons discussed below) Lindley's opinion was entitled to "very little weight." T25.

Rosenberg has not argued that the ALJ erred in any of these findings, nor pointed to any particular error in the ALJ's reasoning. Nonetheless, the Court has reviewed each of the ALJ's findings. As the Court explains next, the ALJ's findings were based upon proper reasoning and supported by substantial evidence.

1. The ALJ's Credibility Determination

The credibility of a claimant's testimony is primarily for the ALJ to decide, not the courts. *Vossen v. Astrue,* 612 F.3d 1011, 1017 (8th Cir. 2010). In assessing the credibility of a claimant's testimony regarding his symptoms, the ALJ must weigh a number of factors (known in the Eighth Circuit as the *Polaski* factors). *See Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009); *see also* 20 C.F.R. § 416.929(c)(3)(i–vii).[10] The ALJ's credibility determination will be upheld if the ALJ provides good reasons for discounting the claimant's subjective complaints—such as inconsistencies in the record, or the *Polaski* factors—and those reasons are supported by substantial evidence. *Gonzales,* 465 F.3d at 895–96.

Here, the ALJ provided several reasons for discounting the subjective complaints of Rosenberg and his grandmother, and those reasons were certainly supported by substantial evidence. T20, 25–26. The Court finds it unnecessary to discuss the ALJ's findings in great length. The ALJ's findings speak for themselves, and Rosenberg has not offered any specific critique of those findings. It is also worth noting that, for the most part, the ALJ incorporated the limitations suggested by Rosenberg and his grandmother. *See* T19–20.

Among other things, the ALJ observed that, "[w]hen questioned at the hearing as to why he is currently unable to work, both [Rosenberg] and his grandmother had difficulties coming up with a legitimate answer." T26. The ALJ noted that Rosenberg's grandmother appeared to want him to remain home so he could help his grandparents with chores that they could no longer do themselves. T26, 46. The ALJ did not err in discounting her testimony on this basis. *Cf. Ownbey v. Shalala,* 5 F.3d 342, 345 (8th Cir. 1993). This finding also found support in Rosenberg's testimony. Later at the hearing, Rosenberg's attorney asked him if he had "any understand[ing] as to why [he] can't work," to which Rosenberg responded, "No, only my grandparents. Usually they need help around the house. So I stay close to the house when they need it." T53.

As to Rosenberg, the ALJ pointed to the following exchange at the hearing:

---

[10] The *Polaski* factors include: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of the claimed symptom; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Moore,* 572 F.3d at 524 (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)).

> Q [ALJ:] Sir, . . . [w]hat problems do you have that would keep you from getting a job and keeping it?"
>
> A [Rosenberg:] Just being lazy.
>
> Q: That's honest anyway.

T26, 41–42. This testimony suggested a lack of motivation to return to work—a factor the ALJ properly utilized in weighing Rosenberg's credibility. *See, e.g.*, *Strongson v. Barnhart*, 361 F.3d 1066, 1072–73 (8th Cir. 2004).

The ALJ also noted a statement Rosenberg made to Sullivan, in July 2011, that he was interested in finding a job doing bicycle repair, but that he was not working because he could not find a job. T24, 428. While looking for work does not prove a claimant can work, it does tend to show that the claimant, at least, believes he might be able to work. That, in turn, reflects negatively on the credibility of the claimant's representation that his impairments prevent him from working.[11] *See Renstrom v. Astrue,* 680 F.3d 1057, 1067 (8th Cir. 2012).

In sum, the ALJ provided well-founded reasons for discounting the testimony of Rosenberg and his grandmother, and his credibility determination will be upheld.

## 2. Morse's Opinion

Morse's June 2010 letter identified several concerns regarding Rosenberg's ability to work in a public setting, including extreme irritability, trouble concentrating, and difficulty working with others. T415. The ALJ declined to give this opinion much weight, and the Court finds no error in that regard. First, as the ALJ explained, this opinion was offered before the full course of Rosenberg's treatment with Morse, in which he demonstrated continued progress and improvement. T23. And the record shows that Rosenberg's condition continued to improve, especially during the relevant period. But Morse's opinion concerns Rosenberg's functioning in June 2010—half a year before the relevant period. Additionally, during the relevant period no other providers, including Morse, identified such severe limitations.

---

[11] This (apparently isolated) attempt to find work does not undermine the ALJ's finding that Rosenberg lacked the motivation to find work. Rather, it provides further support for that finding. When asked by his attorney if he had attempted to find work, Rosenberg testified that it was "not a good time to try to get a job as an assistant [at the bike shop]" and that when he went there, the manager said "it's not a good time for me to have any help right now. Too late in the summer. I said forget it then." T53.

### 3. Lindley's Opinion

In May 2011, Rosenberg met Lindley for a medication refill. T419. In his treatment notes, Lindley noted that Rosenberg was applying for disability, and wrote:

> I think with his psychiatric history, he ought to qualify for disability without any problems to be honest. He has been assessed by Dr. Kimzey multiple times. He is on multiple medications, which I simply prescribe for maintenance, but I think the chance of him holding down a job in the community is remote.

T419. Lindley offered no further explanation for this opinion; and it was not repeated in later notes from his visits with Rosenberg. *See* T435.

Lindley was Rosenberg's treating physician and was, therefore, a "treating medical source." *See* 20 C.F.R. § 416.902. The opinion of a treating source is generally entitled to greater weight than other sources. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). When it is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight. 20 C.F.R. § 416.927(c)(2); *Anderson*, 696 F.3d at 793. Conversely, when a treating source's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002).

The ALJ acknowledged Lindley's status as a treating source, but decided to give his opinion very little weight. The ALJ provided several reasons for this decision. First, opinions that a claimant is "disabled" or "unable to work" concern issues reserved to the Commissioner and are not the type of opinions which receive controlling weight. *Vossen*, 612 F.3d at 1015. Lindley's opinion was just that—he did not state how Rosenberg's conditions resulted in functional limitations, or provide even a general explanation for why he believed Rosenberg to be disabled. Second, the opinion was not supported by any testing or explanation. It was not even supported by Lindley's own treatment notes, which repeatedly stated that Rosenberg was doing well and reporting no significant problems. *See*, T25, 379–80, 420. Finally, Lindley's opinion is inconsistent with the remainder of the evidence from the relevant period, such as Kimzey's April 2011 evaluation and Rosenberg's later visits to Sullivan. T25, 382–84. In those visits, Rosenberg reported that he was doing fairly well and could not identify any particular problems; that his concentration and attention had improved;

and that his outbursts were under control. T430–34. Viewing the entire record, the Court perceives no error in the minimal weight the ALJ afforded Lindley's opinion.

### B. SUFFICIENT MEDICAL EVIDENCE AND DEVELOPMENT OF THE RECORD

Rosenberg next argues that the RFC determination was not supported by sufficient medical evidence, and that the ALJ should have further developed the record. Both arguments are without merit.

Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace. *Cox v. Astrue,* 495 F.3d 614, 619 (8th Cir. 2007). Nevertheless, in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively. *Id.* Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Id.* "When faced with a conclusory opinion by a treating physician, the Commissioner need only come forth with *some* medical evidence that the claimant can work." *Smallwood v. Chater,* 65 F.3d 87, 89 (8th Cir. 1995) (quoting *Frankl v. Shalala,* 47 F.3d 935, 938 (8th Cir. 1995)) (emphasis in original). In such a case, an RFC assessment by a non-treating physician can constitute substantial evidence. *Id.*

Here, the ALJ relied upon the opinion of Kimzey, who examined Rosenberg, as well as the opinions of the non-examining agency consultants, Schmechel and Cottam. The ALJ also conducted an independent review of the medical evidence. Taken together, this constituted sufficient medical evidence and substantial evidence on the record as a whole. *See Krogmeier,* 294 F.3d at 1024.

As such, the ALJ was under no obligation to further develop the record. The ALJ does bear a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case. *Vossen,* 612 F.3d at 1016. However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant; and the ALJ is not obligated to seek further information unless a crucial issue is undeveloped. *Id.* Rosenberg has not identified any issue, crucial or otherwise, that was underdeveloped.

### C. ABILITY TO AFFORD TREATMENT

Rosenberg next observes, in passing, that he lacked the funds to obtain further treatment. Filing 15 at 11. He does not connect this observation to any argument as to how the ALJ erred. As best as the Court can tell, he is arguing that the ALJ failed to properly consider this factor.

In June 2011, Rosenberg reported to Lindley that he had aged out of Medicaid and could not afford his medications. T435. On June 30, Rosenberg obtained refills of his medications through a medical assistance program. On August 26, Rosenberg returned again, reporting that he had run out of insurance and was struggling to get his medications. Lindley noted that Rosenberg was stable, and gave him a 3-month supply of medication. They discussed patient assistance programs, and Lindley wrote that he would do what he could to help. T435.

Economic justifications for the lack of treatment can be relevant to a disability determination. *Murphy v. Sullivan,* 953 F.2d 383, 386 (8th Cir. 1992). However, Rosenberg has offered no testimony or other evidence that he has been denied further treatment or access to prescription medications on account of financial constraints. It is true that the record contains no further treatment notes, from August 2011 through the date of the ALJ's decision in May 2012. However, Rosenberg did not testify, nor does he now claim that this was because he was not receiving treatment.

To the contrary, the record shows that Rosenberg was still being prescribed the same medications by Lindley in September 2011. T197. And at the hearing, his grandmother testified that he was still taking his medications, T47–48, and neither she or Rosenberg testified that he was having trouble obtaining care. Additionally, the claimant's attorney submitted a brief to the ALJ dated April 27, 2012, which did not suggest that Rosenberg was having difficulty affording treatment. T198–215.

In sum, the ALJ did not err in failing to consider Rosenberg's inability to obtain treatment.

### D. ROSENBERG'S GAF SCORES

For his last argument, Rosenberg asserts that the ALJ failed to properly account for his history of low GAF scores. Specifically, he asserts that "[a]lthough the ALJ found the claimant's GAF to be 50, he did not discuss the impact that a 50 GAF score would have on the claimant's ability to perform the functions of ordinary labor." Filing 15 at 8. There are two problems with this argument.

First, it is not supported by the record. The lowest GAF that Rosenberg was assigned for the period under consideration was not 50, but was either 55 or 60, which was Morse's assessment in April 2011. T406.[12] While a score of 50 is associated with serious symptoms, a score of 55 or 60 is associated with

---

[12] Morse actually wrote Rosenberg's GAF score as "60/55." T406, 418. It is not clear what Morse meant by this. However, it is reasonable to assume that one number represented Rosenberg's current GAF, while the other number represented his GAF for another time period, such as his highest GAF for the past year. *See DSM-IV-TR* at 33.

moderate symptoms. Around the same time, Kimzey assessed Rosenberg's score as 65, which is associated with only mild symptoms. T385; *DSM-IV-TR* at 33. And Rosenberg's GAF continued to rise for the period under consideration. By August 2011, Sullivan placed it at somewhere between 71 and 80, which signifies minimal symptoms or only a slight impairment in functioning. T434; *DSM-IV-TR* at 33. Rosenberg has not presented the Court with any reason to doubt these later scores, nor provided any evidence that his GAF decreased thereafter.

Second, while GAF scores may be helpful in assessing disability, they are not essential to determining an individual's RFC. *Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010). The *DSM-IV* itself makes clear that a given score may have little bearing on the subject's occupational functioning. *Id.* That is because a GAF score measures two things—the severity of a subject's symptoms as well as their level of functioning—and it always reflects the worse of the two. *DSM-IV* at 32–33. So, the GAF rating for an individual who is a significant danger to himself, but who is otherwise functioning well, would be below 20. *Id.* at 33.

In determining Rosenberg's RFC, the ALJ considered his GAF scores. See T22–24. But the ALJ also relied upon the record as a whole, and in particular, the opinions of Kimzey, Schmechel, and Cottam, who offered evidence that directly addressed Rosenberg's ability to function in the workplace. And their opinions were, in fact, consistent with Rosenberg's contemporary GAF scores. In sum, the ALJ did not err in his consideration of Rosenberg's GAF scores.

## V. CONCLUSION

The Court has reviewed the administrative record and finds that the ALJ did not err in any of the ways asserted by Rosenberg. The Court therefore concludes that the Commissioner's decision was supported by substantial evidence and should be affirmed.

IT IS ORDERED:

1. The Commissioner's decision is affirmed;

2. Rosenberg's complaint is dismissed;

3. The parties shall bear their own costs; and

4. A separate judgment will be entered.

Dated this 8th day of September, 2014.

BY THE COURT:

John M. Gerrard
United States District Judge